IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RUTH SMITH, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil No. 15-7525 (JBS) |
| COMMISSIONER OF SOCIAL SECURITY, | **OPINION** |
| Defendant. | |

APPEARANCES:

Adrienne Freya Jarvis, Esq.
800 North Kings Highway
Suite 304
Cherry Hill, NJ 08003
    Attorney for Plaintiff Ruth Smith

Paul J. Fishman
UNITED STATES ATTORNEY
    By: James A. McTigue
        Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
300 Spring Garden Street
6th Floor
Philadelphia, PA 19123
    Attorneys for Defendant Commissioner of Social Security

**SIMANDLE**, Chief Judge:

I.  **INTRODUCTION**

    This matter comes before the Court pursuant to 42 U.S.C. §

405(g)for review of the final decision of the Commissioner of

the Social Security Administration denying Plaintiff Ruth K.

Smith's application for disability insurance benefits under

Title II of the Social Security Act, 42 U.S.C. § 401, et seq. Plaintiff, who suffers from coronary artery disease, peripheral artery disease, vertigo, and arthritis in her bilateral hands, was denied benefits for the period beginning July 1, 2011, the alleged onset date of disability, to April 14, 2014, the date on which Administrative Law Judge Daniel L. Shellhamer ("ALJ") issued a written decision.

In the pending appeal, Plaintiff argues that the ALJ's decision must be reversed and remanded on four grounds. Plaintiff contends that the ALJ erred in (1) finding that compensation Plaintiff received in the third quarter of 2011 was substantial gainful activity; (2) failing to acknowledge or assess the weight of a nurse practitioner's opinion in his determination; (3) omitting Plaintiff's mild mental impairments in determining Plaintiff's residual functioning capacity ("RFC"); and (4) omitting Plaintiff's manipulative non-exertional limitations from his formulation of her RFC. For the reasons discussed below, the Court will affirm the ALJ's decision denying Plaintiff disability benefits.

II.     **BACKGROUND**

**A. Procedural History**

Plaintiff Ruth Smith filed an application for disability insurance benefits on February 20, 2012, alleging an onset of

disability on August 1, 2011. (R. at 19.)[1] On June 7, 2012, the
Social Security Administration ("SSA") denied the claim, and a
request for reconsideration on December 20, 2012. (Id.) A
hearing was held on February 19, 2014 before the ALJ, Daniel N.
Shellhamer, at which Plaintiff appeared and testified with
counsel. (Id.) On April 14, 2014, the ALJ denied Plaintiff's
appeal at step four of the sequential analysis, finding that
Plaintiff was capable of performing her past relevant work as an
accounts payable clerk and a secretary. (R. at 29.) The Appeals
Council denied Plaintiff's request for a review. (R. at 1-3.)
Plaintiff then timely filed the instant action.

**B. Medical History**

The following are facts relevant to present motion.
Plaintiff was 62 years old as of the date of the ALJ Decision
and held a high school diploma. Plaintiff had work experience as
a secretary and accounts payable clerk.

**1. Arthritis**

In December of 2007, nearly four years prior to the alleged
disability onset date, Plaintiff sought medical treatment for
injury, pain, and swelling in her left hand. Dr. Carty at
Bordentown Family Medical Center diagnosed her with advanced

---

[1] Through her attorney, Plaintiff amended the onset date to July
1, 2011 at her adjudication hearing, and claimed that that was
the date on which she actually stopped working. (R. at 39.)

osteoarthritis in her first carpal-metacarpal joint. (R. at 390.) Dr. Carty treated Plaintiff again in 2009 and indicated that Plaintiff had arthritis with brief attacks of joint swelling. (R. at 377.)

In May 2012, Dr. Dawoud performed an independent examination on Plaintiff authorized by the SSA. (R. at 452-454.) Plaintiff complained of hand pains, especially in her right hand which made it difficult to grip anything including a pen to write, or a shovel, or perform other chores. (R. at 452.) Dr. Dawoud found Plaintiff's strength was 5/5 in all muscle groups. (R. at 453.) He also noted she had a full range of motion in all joints with no redness, swelling, tenderness, or instability. (Id.) In December 2013, while seeking treatment for unrelated conditions, Plaintiff denied experiencing any arthritis or joint pain. (R. at 502.)

### 2. Peripheral Artery Disease and Coronary Artery Disease

In April of 2009, Plaintiff underwent surgery after experiencing severe bilateral lower extremity claudication symptoms. (R. at 413.) Specifically, Dr. Lee, a vascular surgeon, cut down Plaintiff's right common femoral artery and placed a stent of her right external iliac artery and in her abdominal aorta. (R. at 415.) In a follow-up appointment with Dr. Lee in May 2009, Plaintiff stated she was up and ambulating

4

and no longer had symptoms of claudication. (R. at 414.)
Plaintiff did not report to additional scheduled follow-up
appointments with Dr. Lee or contact him for two years. (Id.)

In May 2011, Plaintiff again sought treatment for her lower
extremities from Dr. Lee. (R. at 413.) Plaintiff reported that
her right leg "locked up" and that she was only able to walk
approximately one-half block without rest. (Id.) On June 27,
2011, three days prior to the alleged onset date of disability,
Dr. Lee performed surgery on Plaintiff to treat bilateral lower
extremity claudication due to high-grade stenosis within the
proximal common iliac arteries. (R. at 432.) Three days later,
on June 30, 2011, Plaintiff was deemed stable on her feet and
discharged from the hospital. (R. at 432.)

During a follow-up visit in July of 2011, Dr. Lee indicated
that Plaintiff's groin incision had healed well and that she
should progressively increase her activities. (R. at 411.) Dr.
Lee next examined Plaintiff in January of 2012 for reassessment
of her lower extremities. (R. at 409.) Plaintiff reported that
she had progressively increased her activity, abstained from
smoking, and denied any disabling claudication symptoms. (Id.)
Dr. Lee noted that "[n]oninvasive arterial studies from November
show[ed] a mild degree of vascular occlusive disease on the
right at rest and with activity and minimal examination of
disease on the left." (Id.) Dr. Lee found she "continued to do

5

well" and again recommended conservative measures of exercise. (Id.)

During her examination with Dr. Dawoud, authorized by the SSA in May of 2012, Plaintiff complained of chronic leg pain after twenty minutes of standing or walking a hundred yards (R. at 452-53.) Plaintiff reported pain mainly in the back of her thighs and that her legs sometimes lock up on her. (Id.) Dr. Dawoud found no evidence of cyanosis, clubbing, or edema in Plaintiff's extremities and found that Plaintiff's pulses were also equal and full in all four extremities. (Id.) Dr. Dawoud noted that Plaintiff walked without a limp and found it unclear why Plaintiff still had such severe pain when walking despite positive results of her physical examination. (R. at 453.)

### 3. Vertigo

In March of 2008, Plaintiff first sought treatment at Robert Wood Johnson Hamilton Emergency for sudden vertigo accompanied by nausea and vomiting. (R. at 240.) Plaintiff was given CT scan of the head which showed nothing out of the ordinary. (Id.) In August of that year, Plaintiff sought additional treatment for dizziness accompanied by hearing loss and consulted with Dr. Burstein, an ear, nose, and throat specialist. (R. at 242-43.) Upon examination, Plaintiff reported that she was able to function in her daily life, but was bothered by vertigo after sudden head movements. (R. at 242.)

6

Dr. Burstein diagnosed Plaintiff with viral labyrinthitis and proscribed no additional medication, noting that it would take six to twelve months before Plaintiff's body learned to compensate for her weakened vestibular nerve. (R. at 243.)

In April of 2010, Plaintiff underwent additional diagnostic testing after she complained of persisting dizziness and unsteadiness. (R. at 257.) While Dr. Kaiser found Plaintiff's strength and gait were normal, he recommended she get an MRI of her brain. (R. at 258.) The MRI interpreter noted that Plaintiff had more neurological abnormalities than expected of a patient her age but did not opine on the cause of her symptoms. (R. at 277.)

In her independent examination with Dr. Dawoud in May 2012, Plaintiff alleged that she "intermittently" suffered from vertigo and had to move slowly. (R. at 452.) She also stated she had trouble with her balance and experienced dizziness. (Id.) Upon examination, Dr. Dawoud found Plaintiff's cranial nerves II through XII intact, her upper and lower extremities equal, and her Romberg test negative. (R. at 453.) Dr. Dawoud noted that Plaintiff had difficulty balancing on either leg and remarked she may benefit from seeing a specialist for vertigo. (Id.)

In May 2012, Dr. Rampello also examined Plaintiff on behalf of the SSA. (R. at 66-68.) After reviewing both Plaintiff's medical history and her complaints of dizziness, difficulty

balancing, and history of falls, Dr. Rampello opined that
Plaintiff could occasionally lift or carry twenty pounds and
frequently lift or carry ten pounds. (R. at 66-67.) Dr. Rampello
also found that she could likely stand or walk for four hours
and sit for six hours with normal breaks in an eight hour
workday. (Id.) Dr. Rampello also noted that Plaintiff had no
restrictions on her ability to push or pull. (Id.) Further, Dr.
Rampello concluded that Plaintiff had some postural limitations,
but no manipulative, visual, or communicative limitations. (R.
at 67.) Specifically, Plaintiff could occasionally climb
ramps/stairs, balance, stoop, kneel, crouch, and crawl, but
never climb ladders, ropes, or scaffolds. (Id.) Dr. Rampello
also found that Plaintiff should avoid concentrated exposure to
hazards like heights and machinery, but had no other
environmental limitations. (R. at 67-68.)  Dr. Rampello
concluded that Plaintiff's limitations would not prevent her
from performing her past relevant work as a secretary. (R. at
69.)

In October of 2012, Dr. Golish conducted an additional
assessment for the SSA as part of Plaintiff's reconsideration of
the denial of her disability benefits. (R. at 78-80.) Dr. Golish
affirmed Dr. Rampello's assessment of Plaintiff's residual
functional capacity in its entirety and similarly concluded

Plaintiff could perform her past relevant sedentary work as it was actually performed. (R. at 81.)

In April of 2013, Plaintiff checked into the emergency room at Robert Wood Johnson Hamilton alleging multiple falls caused by dizziness within the last three to six days. (R. at 456-481.) A CT scan found no evidence of an acute intracranial hemorrhage, but moderate diffuse cortical atrophy with chronic small vessel changes of the deep white matter. (R. at 457.) The neurology exam also found that Plaintiff was oriented to person, place, and time, that she had normal speech, gait, and memory, that she had no focal sensory or cerebellar deficits, and that her cranial nerves were intact. (R. at 472.) Due to the negative diagnostic exam results, Plaintiff was diagnosed with vertigo, discharged, and given a prescription for meclizine to help alleviate symptoms. (R. at 475-76.)

In May of 2013, Plaintiff sought additional treatment for vertigo at Bordentown Family Medical Center with Nurse Practitioner Nawrock. (R. at 496-501.) Treatment notes from that visit indicate that Plaintiff reported sudden episodes of dizziness that increased in frequency and moderately limited her activities. (R. at 496.) Plaintiff alleged to have lost 40% of hearing in her left ear. (Id.) Nurse Practitioner Nawrock's treatment notes also included the following instructions for Plaintiff: "Vertigo – Medrol dosepak one tab po as directed.

9

Rest. Plenty of fluids. Use supportive measures to avoid falls. RTO if S&S worsen or persist more than 10 days. Consider referral to ENT, F/U with PCP. Patient verbalizes understanding of instructions." (R. at 498.)

In December of 2013, Plaintiff again sought treatment at Bordentown Family Medical Center. (R. at 501-507.) At that visit, Plaintiff denied dizziness, headache, or hearing trouble. (R. at 502.) Dr. Lugo's treatment notes indicate that Plaintiff reported having an unsteady gait and a history of falls within the past twelve months. (R. at 507.)

### 4. Mental Impairments

Plaintiff first sought treatment for depression and anxiety in September of 2010. (R. at 288.) Plaintiff claimed she was anxious, sad, had low energy, and suffered from bad concentration for the previous six months. (Id.) Plaintiff attributed her mental status to a lot of changes in her job; specifically, Plaintiff mentioned that several coworkers were laid off and that her responsibilities at work had been restricted. (Id.) Dr. VanHise diagnosed Plaintiff with depression, proscribed her Lexapro, and recommended that Plaintiff seek counseling. (R. at 289.) Plaintiff did not follow Dr. VanHise's recommendation to seek counseling. (Id.)

Plaintiff continued to seek treatment for depression through April of 2013. (R. at 280-288, 500.) Plaintiff's

10

treatment notes from October 2010 indicate that she was content with her diagnosis. (R. at 286.) After beginning medication, Plaintiff reported that her concentration improved and that she no longer had trouble getting up and going to work. (Id.) Treatment notes from January 2011 indicate that Plaintiff's depression was "stable." (R. at 279, 284.) In August 2011, Plaintiff switched her medication from Lexapro to Zoloft, but noted that her condition remained stable. (R. at 280.) Prior to receiving bloodwork for an unrelated issue in March of 2012, Plaintiff suggested that symptoms from her depression were alleviated by medication, including any difficulty concentrating. (R. at 417.) Additionally, her orientation, mood and affect, speech, thought processes, and judgement were all found to be normal. (R. at 418-419.)  As of December 2013, Plaintiff's medical history chart classified her depression as "active." (R. at 500.)

In May of 2012, Dr. Brown performed a consultative psychological examination on Plaintiff for the SSA. (R. at 447-450.) Dr. Brown's report stated that Plaintiff's insight and judgement were intact and she was oriented to person, place, and time. (R. at 449.) Further, Dr. Brown reported that her speech was fluent and clear. (Id.) She was able to express her thoughts and feelings without hesitation or delay. (Id.) Moreover, Dr. Brown found that Plaintiff's thought processes were coherent and

11

goal directed, and that her thought content revealed no evidence of illusions, delusions, hallucinations, or paranoia. (Id.) Dr. Brown assigned Plaintiff a GAF score of 55 to 60. (R. at 450.)

Psychological consultants engaged by the SSA, Dr. Bortner and Dr. Wieliczko, also examined Plaintiff. (R. 64-65.) Dr. Bortner found that Plaintiff had no work-related limitation despite mild restrictions on her daily life, no limitation on her social functioning, and no limitation in her concentration, persistence, and pace. (R. at 65.) Dr. Bortner opined that Plaintiff could understand and execute both simple and complex instructions, make work related decisions, interact with others, and adapt to workplace change. (Id.) Dr. Wieliczko agreed with Dr. Bortner's opinion. (R. at 76-77.) After a complete review of Plaintiff's mental health records, Dr. Wieliczko concluded that Plaintiff had no mental impairments that would impact her ability to function in the workplace. (R. at 77.) Dr. Wieliczko also determined that Plaintiff's condition had not worsened since Dr. Bortner's initial examination. (Id.)

**C. ALJ Decision**

In a written decision dated April 14, 2014, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act at any time through the date of the decision because she was capable of performing past relevant work as an accounts payable clerk and a secretary. (R. at 19.)

12

At the first stage of the five-step sequential evaluation process, the ALJ determined that Plaintiff engaged in substantial gainful activity in the third quarter of 2011, after the alleged onset date of disability, July 1, 2011. (R. at 21.) However, the ALJ found that Plaintiff did not engage in substantial gainful activity in the fourth quarter of 2011, or at any later time through the date of the Decision. (Id.) The ALJ continued the five-step evaluation process but only with respect to the time in which Plaintiff did not engage in substantial gainful activity.

At step two, the ALJ determined that Plaintiff suffered from the following "severe impairments: coronary artery disease, peripheral artery disease, vertigo, and arthritis in her bilateral hands." (R. at 22.) The ALJ found that Plaintiff's mental impairments were non-severe because they did not cause more than a minimal limitation in Plaintiff's ability to perform basic mental work activities. (R. at 23-24.) The ALJ noted that, despite claimant's depressive symptoms, she lived alone and had no problem taking care of her personal needs. (R. at 22.) Plaintiff took care of her cat, cooked, cleaned, did laundry, washed dishes, and took out garbage. (Id.)  In addition, she drove, shopped, handled money, paid bills, counted change, and handled a savings account. (Id.) The ALJ also determined that Plaintiff only had a mild limitation in social functioning

13

because Plaintiff had a normal mood, maintained good eye contact, and had no problem getting along with others. (Id.)

ALJ Shellhamer further determined that Plaintiff's concentration, persistence, and pace were only mildly limited based on Plaintiff's own statements and the medical opinion of Dr. Brown. (R. at 23.) Plaintiff reported no problems paying attention and that she was able to follow written and spoken directions. (Id.) Dr. Brown found that she was oriented to person, place, and time; her speech was fluent and clear; and her thought processes were coherent and goal directed. (R. at 23-24.) Additionally, the ALJ noted that although Plaintiff alleged that her depression was severe, she never sought counseling and had stopped taking medication. (R. at 24.) Moreover, when Plaintiff sought treatment for depression, her symptoms were alleviated by medication. (Id.) The ALJ relied on Plaintiff's past treatment notes which indicated her depression was chronic and stable. (Id.) Plaintiff also had not experienced any episodes of decompensation. (Id.)

Despite recognizing Plaintiff's physical impairments as severe, at step three, the ALJ concluded that Plaintiff's impairments did not meet, or equal in severity, any impairment found in the Listing of Impairments set forth in 20 C.F.R. Part 404. (R. at 24.)

At step four, the ALJ determined that Plaintiff possessed the residual functioning capacity to perform a full range of light work, except that:

> The claimant can lift and carry twenty pounds occasionally and ten pounds frequently. Further, the claimant can stand and/or walk for four hours and sit for six hours in an eight-hour workday. The claimant can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but can never climb ladders, ropes or scaffolds. Finally, the claimant must avoid concentrated exposure to hazards, such as machinery and heights.

(R. at 25.) Although the ALJ found that Plaintiff's physical impairments caused her alleged symptoms, he found her statements concerning the intensity, persistence, and limiting effects of those symptoms not credible. (R. at 29.) Ultimately, the ALJ determined that Plaintiff's RFC allowed her to complete sedentary exertional work; therefore, the ALJ determined Plaintiff could perform her past relevant work as an accounts payable clerk and secretary, and found Plaintiff not disabled. (R. at 29-30.)

In support of this conclusion, the ALJ evaluated Plaintiff's testimony and the testimony of her representatives regarding her ability to engage in daily activities; the observations of treating physicians; her use of medications; and the intensity, persistence, and limiting effects of symptoms associated with her medical conditions. (R. at 25-30.) Specifically, with respect to Plaintiff's arthritis, the ALJ

15

concluded from x-rays from 2007 and 2009 that the severity of her condition had stayed the same from the date of her diagnosis to the alleged onset date of disability because her medical records contained "no updated x-rays or treatment records from the period at issue regarding the claimant's hand arthritis." (R. at 27.) Similarly, the ALJ noted that while Plaintiff reported vertigo as her main problem, she continued to work after her diagnosis. (R. at 28.)

In assessing Plaintiff's exertional limitations, the ALJ gave great weight to the SSA medical consultants, Dr. Rampello and Dr. Golish, who both opined that Plaintiff could stand or walk for four hours and sit for six hours during an eight hour workday. (Id.) They also found that Plaintiff could "occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but could never climb ladders, ropes, or scaffolds." (R. at 29.) After considering of the totality of the objective medical evidence, the ALJ concluded that Plaintiff possessed the functional capacity to adequately perform many basic activities associated with work. (R. at 29.)

The ALJ noted several inconsistencies that adversely affected Plaintiff's credibility. Namely, Plaintiff's testimony as to her daily activities, like performing household chores and gardening, appeared inconsistent with her allegations of total disabling symptoms and limitations. (R. at 26.) Further, despite

16

Plaintiff's allegations of totally disabling symptoms, no restrictions were recommended by a treating doctor. (R. at 29.)

III.    STANDARD OF REVIEW

     This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The Court's review is deferential to the Commissioner's decision, and the Court must uphold the Commissioner's factual findings where they are supported by "substantial evidence." 42 U.S.C. § 405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Cunningham v. Comm'r of Soc. Sec., 507 F. App'x 111, 114 (3d Cir. 2012). Substantial evidence is defined as "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 400 (1971); Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012) (using the same language as Richardson). Therefore, if the ALJ's findings of fact are supported by substantial evidence, the reviewing court is bound by those findings, whether or not it would have made the same determination. Fargnoli, 247 F.3d at 38. The Court may not weigh the evidence or substitute its own conclusions for those of the ALJ. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011). Remand is not required where it would not affect the outcome of the case. Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005).

17

IV.     DISCUSSION

A. Legal standard for determination of disability

In order to establish a disability for the purpose of disability insurance benefits, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." Plummer v. Apfel, 186 F.3d 422, 426 (3d Cir. 1999); 42 U.S.C. § 423(d)(1). A claimant lacks the ability to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Plummer, 186 F.3d at 427–428; 42 U.S.C. § 423(d)(2)(A).

The Commissioner reviews claims of disability in accordance with the sequential five-step process set forth in 20 C.F.R. § 404.1520. In step one, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." 20 C.F.R. § 1520(b). Present engagement in substantial activity precludes an award of disability benefits. See Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  In step two, the claimant must demonstrate that the claimant suffers from a "severe impairment."  20 C.F.R. § 1520(c).  Impairments lacking

18

sufficient severity render the claimant ineligible for disability benefits.  See Plummer, 186 F.3d at 428.  Step three requires the Commissioner to compare medical evidence of the claimant's impairment to the list of impairments presumptively severe enough to preclude any gainful activity.  20 C.F.R. § 1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Plummer, 186 F.3d at 428. Step four requires the ALJ to consider whether the claimant retains the ability to perform past relevant work. 20 C.F.R. § 1520(e). If the claimant's impairments render the claimant unable to return to the claimant's prior occupation, the ALJ will consider whether the claimant possesses the capability to perform other work existing in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. § 1520(g); 20 C.F.R. 404.1560(c).

**B. The ALJ did not err in finding that Plaintiff engaged in substantial gainful activity during the third quarter of 2011.**

Plaintiff argues first that the ALJ erred in finding that Plaintiff was ineligible for disability benefits during the third quarter of 2011 in step one of the sequential analysis because she had engaged in substantial gainful activity. (Pl. Br. at 20.) Although the record indicates that Plaintiff was paid $3,744 during the third quarter of 2011, Plaintiff claims

19

that this was compensation for work done prior to her termination on July 1, 2011, and that this income should not preclude a finding that she was disabled during that time period.

Substantial gainful activity is defined as "significant mental or physical duties" done for "pay or profit." 20 C.F.R. § 404.1572. A plaintiff bears the burden of demonstrating the absence of any substantially gainful activity in her application for disability benefits.  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999). Earnings derived from work activity are generally the primary consideration in evaluating whether work qualifies as substantial gainful activity. 20 C.F.R. § 404.1574(a)(1); Beeks v. Comm'r of Soc. Sec., 363 F. App'x 895, 896-97 (3d Cir. 2010). If an individual's earnings average more than $1,000 per month in a calendar year, or $3,000 on a quarterly basis, such earnings generally show that the individual has engaged in substantial gainful activity. 20 C.F.R. § 404.1574(b)(2)(vii).

There is substantial evidence in the record to support the ALJ's finding that Plaintiff engaged in substantial gainful activity in the third quarter of 2011. First, Plaintiff provided conflicting information regarding when she was laid off; while she claimed at the hearing that she stopped working July 1, 2011, she indicated twice on her disability benefits application

20

that she was laid off on July 29, 2011. (R. at 151, 166).
Further, earnings statements in the record before the ALJ
demonstrate that Plaintiff was paid $3,750 from Thompson
Management, LLC for the third quarter of 2011. (R. at 136.)
These earnings exceed the $3,000 threshold established in the
regulations to show that Plaintiff engaged in substantial
gainful activity during the quarter. Additionally, the ALJ noted
that Plaintiff collected unemployment insurance benefits after
she was laid off on July 1, 2011. (R. at 26, 136, 151.) The ALJ
pointed out the inconsistency between Plaintiff's representation
in this matter that she was disabled as of July 1, and
Plaintiff's representation to the Department of Labor that she
was entitled to receive unemployment compensation benefits
because she was "ready, willing, able to work, and out looking
for work." (R. at 26.)

Although Plaintiff asserts these earnings stem from work
done prior to July 2011, she has failed to provide any evidence
to support this claim. The Court finds that the ALJ did not err
by concluding that Plaintiff was ineligible for disability
benefits from July 2011 through September 2011.

**C. The ALJ's evaluation of Nurse Practitioner Nawrock's May
2013 treatment notes is supported by substantial evidence.**

Next, Plaintiff claims the ALJ erred by failing to evaluate
or discuss Nurse Practitioner Nawrock's recommendation that

21

Plaintiff "use supportive measures to avoid falls" in his RFC assessment. Plaintiff admits that Ms. Nawrock was not an "acceptable medical source" as defined by 20 C.F.R § 404.1513(a), but nonetheless, argues that the ALJ erred because he was required to evaluate Ms. Nawrock's opinion as a nurse practitioner as part of his RFC assessment. Id.

Evidence from an "acceptable medical source" must be used to establish an impairment, but once established, evidence from "other sources" may be used to show the severity of the impairment and how it affects a Plaintiff's ability to function. 20 C.F.R. §§ 416.913(a) and (d); SSR 06-03p. "Other sources" may include medical sources such as nurse practitioners, physician's assistants, and therapists. 20 C.F.R. § 416.913(d)(1). The weight due to an opinion from an "other source" depends on factors including "how consistent the opinion is with other evidence," "the degree to which the source presents relevant evidence to support the opinion," and "how well the source explains the opinion." SSR 06-03p; see also 20 C.F.R. §§ 404.1527(d) and 416.927(d) (discussing factors applicable to weighing medical opinion evidence).

In this case, the ALJ acknowledged that Plaintiff's severe impairments included vertigo, based on evidence from "acceptable medical sources." (R. at 22.) Ms. Nawrock's opinion that Plaintiff should use supportive measures to avoid falls,

however, was inconsistent with the findings of other physicians who conducted comprehensive examinations of Plaintiff; no other acceptable medical source who treated Plaintiff for vertigo included a similar finding in his or her treatment notes. (R. at 67, 81, 453, 476.) The ALJ gave great weight to both Dr. Rampello's and Dr. Golish's findings, who opined that Plaintiff could stand or walk for four hours a day in their RFC analyses. (R. at 28.) Dr. Betancourt's evaluation of Plaintiff in April 2013 also contradicted Plaintiff's claim that her vertigo worsened over time. (R. at 472.) Despite Plaintiff's claims of repeated falls, Dr. Betancourt found that her speech, gait, and memory were normal. (Id.) Dr. Betancourt also found no neurological explanation for Plaintiff's complaints and noted that her symptoms were alleviated by medication. (Id.) Accordingly, Ms. Narock's opinion that Plaintiff should use supportive measures to avoid falls was inconsistent with the other objective medical evidence on record.

Additionally, Ms. Nawrock offered no support or explanation for her opinion in her treatment notes. (R. at 498.) Ms. Nawrock provided no work-related assessment or supporting documentation regarding the severity of Plaintiff's vertigo in her Patient Medication Summary. (Id.) Instead, the instruction was on a general medication summary alongside directions to "rest" and "take plenty of fluids." (Id.) The context in which Ms.

23

Nawrock's opinion was issued suggests that it was a generic instruction based on Plaintiff's complaints, rather than a work-related assessment.

The ALJ's failure to discuss Ms. Nawrock's opinion that Plaintiff should use supportive measures was therefore only a harmless error because the ALJ would have been entitled to accord it little weight under SSR 06-09p. "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409 (2009); see also McLeod v. Astrue, 640 F.3d 881, 887 (9th Cir. 2011) (applying Sanders to social security proceedings); Lippincott v. Comm'r of Social Sec., 982 F. Supp. 2d 358, 380-81 (D.N.J. 2013) (same). The presumption that a particular error is per se harmful is at odds with the rule that it is the claimant's burden to show prejudice from an agency decision. See Sanders, 556 U.S. at 407 ("We have previously warned against courts' determining whether an error is harmless through the use of mandatory presumptions and rigid rules rather than case-specific application of judgment, based upon examination of the record.") Because Plaintiff cannot show that discussing Ms. Nawrock's instruction further would have changed the outcome of her case, remand is not required. Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005). The Court finds that the ALJ did not err by failing to discuss Nurse Practitioner

24

Nawrock's May 2013 recommendation that Plaintiff use supporting measures in his opinion.

### D. The ALJ did not err in his evaluation of Plaintiff's mental impairments in his formulation of her RFC.

Next, Plaintiff argues that the ALJ erred by not accounting for her mental limitations at step four of the sequential analysis. (Pl. Br. at 15-18.) Specifically, Plaintiff contends the ALJ did not include her non-severe mild mental limitations in his formulation of her RFC.

An individual's residual functional capacity, or RFC, is an assessment of the most that person can still do in a work setting, despite the limitations caused by his impairments. 20 C.F.R. § 404.1545(a). In reviewing the record to make an RFC assessment, the ALJ must consider all relevant medical opinion evidence and all other relevant evidence in the record. 20 C.F.R. § 404.1527(b); Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). The ALJ must consider limitations imposed by all of an individual's impairments, even those that are not "severe." 20 C.F.R. § 404.1545(a)(2)-(3). The ALJ must allocate weight to each medical opinion upon which he relies. Shaud v. Colvin, Case No. 15-2278, 2016 WL 1643405, at *7 (D.N.J. Apr. 26, 2016). Additionally, the ALJ's RFC formulation must "be accompanied by a clear and satisfactory explanation of the basis on which it rests." Fargnoli v. Massanari, 247 F.3d

34, 41 (3d Cir. 2001) (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).

The Court disagrees with Plaintiff's assertion that the ALJ failed to account for Plaintiff's non-severe mental limitations in formulating her RFC. The ALJ clearly considered Plaintiff's depression at step four, but concluded that Plaintiff's symptoms did not significantly limit her basic work activities. (R. at 23.) He noted that, at the time of her hearing, Plaintiff was not seeking treatment or counseling and did not take medication for her depression. (R. at 24.) The ALJ also noted that when Plaintiff did seek treatment, her depression was chronic, stable, and alleviated by medication, and that when she took her medication as prescribed, her symptoms did not significantly limit her activities. (Id.)

In addition, the ALJ discussed the basis for his formulation of Plaintiff's RFC, including the weight assigned to each of the relevant medical opinions on which he relied. The ALJ assigned great weight to the psychological consultants, Dr. Bortner and Dr. Wieliczko, who both opined that Plaintiff had no work-related mental impairment despite mild limitations in daily living, social functioning, and concentration, persistence, and pace. (Id.) The ALJ found that these opinions were consistent objective medical evidence. (Id.) Conversely, the ALJ determined that Dr. Brown's assigned GAF score carried little weight

26

because it was inconsistent with Dr. Brown's own treatment notes which indicated that Plaintiff was pleasant and cooperative, that her overall presentation was adequate, and that her eye contact was appropriate. (Id.)

It is not this Court's role to re-weigh the evidence in the record. See Gantt v. Comm'r Soc. Sec., 205 F. App'x 65, 67 (3d Cir. 2006) ("[O]ur role is not to weigh the evidence; our role on review is limited to determining whether substantial evidence supports the ALJ's denial of disability benefits."). Accordingly, because the ALJ considered all of Plaintiff's diagnosed mental limitations and provided a thorough basis for excluding that impairment in his RFC formulation, the Court finds that the ALJ's RFC assessment is supported by substantial evidence.

### E. The ALJ did not err in evaluating Plaintiff's arthritis in formulation of her RFC.

Finally, Plaintiff argues that the ALJ erred by failing to properly account for her bilateral arthritis in his formulation of her RFC. (Pl. Br. at 18-20.) Additionally, Plaintiff contends the ALJ's wrongly assumed that the severity of her arthritis remained unchanged since the time of her original diagnosis.

The Court finds that the ALJ appropriately considered Plaintiff's arthritis when formulating her RFC. Plaintiff's allegation that her arthritis was omitted in the ALJ's RFC

27

assessment is inaccurate; the ALJ discussed both Plaintiff's x-rays demonstrating advanced osteoarthritis in the first carpal-metacarpal joint in 2007 and treatment notes from 2009 which indicate that her arthritis caused attacks of joint swelling. (R. at 27.) He also pointed out, however, that Plaintiff's arthritis did not keep her from working at the time of diagnosis and for several years thereafter, strongly suggesting it would not currently prevent her from future work. (Id.)

The ALJ also discussed his reasons for not crediting Plaintiff's complaints that her arthritis would impact her functioning in the workplace. Plaintiff testified at the hearing before the ALJ that she took care of her cat, cooked, cleaned, did laundry, washed dishes, and took out garbage. (R. at 26.) In addition, she drove, shopped, handled money, payed bills, counted change, and handled a savings account. (Id.) The ALJ also noted that Plaintiff described her termination as being "laid off" and filed for unemployment, suggesting she was ready, able, and willing to work. (R. at 26.) Finally, the only examination of Plaintiff's arthritis during the relevant period was Dr. Dawoud's independent examination in May 2012. (R. at 452-454.) Dr. Dawoud's notes stated that Plaintiff had a full range of motion in all joints with no redness, swelling, tenderness, or instability. (R. at 453.)

Plaintiff further claims that the ALJ failed to consider that arthritis is a degenerative disease which worsens with time. Plaintiff failed to provide, however, any objective medical evidence to support her claim. The Court finds Plaintiff's argument for remand on this basis unpersuasive because she has the initial burden of proof under step four of the sequential analysis. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994). Allegations of pain and other subjective symptoms advanced by a claimant must be supported by objective medical evidence. Id. The ALJ "is entitled to rely not only on what the record says, but also on what it does not say." Lane v. Comm'r of Soc. Sec., 100 F. App'x 90, 95 (3d Cir. 2004). Without objective medical evidence on the record to substantiate Plaintiff's claim that her condition worsened, the ALJ correctly relied on what the evidence did not demonstrate – Plaintiff's inability to pursue her former occupation because her arthritis worsened.

Given that the ALJ discussed the objective medical evidence in Plaintiff's record, and that Plaintiff failed to produce any evidence to demonstrate her arthritis worsened, the Court finds the ALJ's RFC formulation is supported by substantial evidence.

## V. Conclusion

For the foregoing reasons, the Court finds that the ALJ committed no reversible errors in determining that Plaintiff is

not disabled. As a result, the ALJ's decision will be affirmed.

An accompanying Order will be entered.


**July 19, 2016**                    **s/ Jerome B. Simandle**
Date                                 JEROME B. SIMANDLE
                                     Chief U.S. District Judge